## B. L. REED *v.* THE STATE.

1. DISQUALIFICATION OF JUDGE.— The Code of Procedure enacts that no judge shall "sit in any case" where he is the party injured, has been of counsel, or is connected with the accused or the party injured within the third degree of consanguinity or affinity. This provision disables a judge not only from trying a cause in which he is thus disqualified but from making any order in it. On the other hand, if the judge of the forum is not thus disqualified he cannot recuse himself, nor, by certifying that he is disqualified, enable the governor to appoint a special judge to try the cause.

2. SAME — SPECIAL JUDGE — CASE STATED.— Appellant and one S. were jointly indicted for murder, but the latter was never arrested. The judge of the forum, though in no degree connected with the appellant, was related to S. by a disqualifying consanguinity, and therefore entered an order purporting to recuse himself from trying the appellant, and the governor appointed a special judge to try the cause. Appellant filed a special plea alleging that the regular judge of the forum was not disqualified to try him, and that the special judge was not legally authorized to do so; to which plea a demurrer was sustained. *Held* error. The plea was a good one to the jurisdiction of the court. Otherwise, however, if appellant and S. had been jointly on trial.

3. MURDER — CHARGE OF THE COURT.— See evidence in a trial for murder which, it is held, justified the trial court in giving in charge to the jury the law of aiders and abettors.

APPEAL from the District Court of Brazos. Tried below before A. C. BRIETZ, Esq., Special Judge.

The indictment was filed September 10, 1881, and charged that the appellant and Reuben Stillwell, about the 23d of the preceding July, did with malice aforethought kill Cicero Porter, by shooting him with a pistol. The indictment was framed in conformity with the act of March 26, 1881, called the "common-sense indictment act." At the same term of the court the appellant alone was tried before a special judge appointed by the governor, in consequence of a notification that the regular judge was disqualified to sit in the case. An order of the court was entered of record, reciting that the regular judge was second cousin of Reuben Stillwell, and therefore was disqualified and recused himself. The defendant filed a special plea, and alleged in it that the regular judge was not disqualified, and that the special judge had no jurisdiction to try him, the defendant. Counsel for the State filed an answer which in effect was tantamount to a general exception or demurrer to the plea. The trial court overruled the plea, and the defense reserved exceptions to the ruling. The defendant was then arraigned and pleaded not guilty. A trial ensued, and the jury found the defendant guilty of murder in the second degree, and assessed his punishment at a term of five years in the penitentiary.

In the town of Bryan, county of Brazos, on the 23d of July, 1881, James Porter and Oliver Porter were shot and instantly killed in Nall's saloon, of which, according to the testimony, Reuben Stillwell was an habitue. The trial from the result of which this appeal is taken was one of the consequences of the homicide. Many witnesses were examined by the State and by the defense, and their testimony is characterized by many circumstantial discrepancies, arising, doubtless, from their different stand-points and the prevailing excitement.

J. P. Campbell was the first witness examined by the State. From his and other testimony, and a diagram, it appears that Nall's saloon occupies the south half of a brick building, fifty feet wide, which fronts west upon Main street in Bryan. The north half of the building is separated from the saloon by a plank partition, and was occupied as a barber shop at the time of the homicide. On the south of the saloon, and adjoining it, is English's store, and on the north of the barber shop, and adjoining it, is Hanway's store. In the front of the brick building occupied by the saloon and barber shop there were three doors, by the most southern of which the saloon was accessible through self-closing lattice door-shutters. The most northern of the three doors entered the barber shop, and by the middle door access could be had either to the saloon or the barber shop, as the partition between them did not reach the front wall but left a door or passway between the saloon and the barber shop. On the outer edge of the pavement in front of the saloon stood a bench of which frequent mention occurs in the testimony.

The State's witness Campbell testified that as he was passing up the pavement in a northerly direction he observed that in front of the saloon the pavement was occupied by a crowd of men. The defendant Reed was sitting on the bench, and Dr. Erwin was standing about the middle of the pavement. The defendant said, "Let's fight it out right here," and Erwin replied "All right." The defendant got up, advanced, and knocked Irwin down. James Porter was then standing between the defendant and the door of the saloon, and the defendant, on knocking Erwin down, turned so as to approach close to James Porter, who struck at the defendant with a pair of saddle-bags. The witness thought that the saddle-bags "brushed" the arm of the defendant, who thereupon seized James Porter and pushed him through the lattice doors and into the saloon, and while so doing

was drawing a pistol from his own hip-pocket. The lattice doors immediately closed behind them, and the firing began at once. The witness heard three shots, and then saw Reuben Stillwell run out of the saloon and on to the pavement, bare-headed, in his shirt sleeves, and with a pistol in his hand. For a moment Stillwell stood on the pavement, with his pistol presented as if he was sighting it through the lattice door, and then went back into the saloon. After Stillwell got back into the saloon, the witness heard two more shots in the saloon. The first three shots were fired near the front and the last two about the middle of the saloon, but witness could see none of the parties inside the saloon at the time. After the firing ceased he went into the saloon, and in the space between the front wall and the end of the counter saw James Porter lying dead. About twenty feet from the front of the saloon, and in front of the counter, lay Cicero Porter, dead. The last two shots came from the spot at which he lay, and the witness thought he heard Cicero Porter halloo " Oh Lord," when they were fired. James Porter was shot in the head, and Cicero in the left side. When the difficulty began the witness was on the pavement in front of English's store, and when the shooting began he stepped into English's north door, which was about four feet from the lattice door through which the defendant and James Porter went into the saloon.

On his cross-examination the witness re-stated the brief colloquy between the defendant and Dr. Erwin, thus: " Defendant said 'Let's fight it out;' Erwin said if he had defendant out of the corporation he could whip him; defendant said ' Let's fight it out here;' Erwin said ' all right.'" The witness stated that when the defendant struck Erwin and knocked him down, Erwin was revolving his fists around each other. Witness was certain that when the defendant and James Porter passed through the lattice doorway, the latter was foremost but was

moving backwards, and the defendant had his hand on him. When the first three shots were fired, Erwin was lying face upwards on the pavement, but when Stillwell came out of the saloon, just after the third shot, Erwin got up and took a seat in the door of the barber shop. Witness was standing in English's door, and could see up and down the pavement. He thought James Porter was killed when the first three shots were fired. When the defendant and James Porter went into the saloon, five or six other persons also went in; some of them entered through the door next to the barber shop. When witness came up to the crowd in front of the saloon Erwin and the defendant were talking. Erwin seemed to be smiling, and told the defendant to "pitch in," or "hit me first." Defendant did not strike Erwin with a pistol, but with his fist. Stillwell came up just in front of the witness, spoke to the crowd, and went into the saloon; he seemed to have just gotten off his horse. Witness did not observe Cicero Porter enter the saloon; he did not know Cicero Porter at that time. Defendant's pistol was short and chunky; it was a bright pistol about five or six inches long. On his re-examination the witness said he did not pretend to describe the defendant's pistol. He saw the bodies of the deceased immediately after the shooting, but did not examine to ascertain whether they were armed. James Porter's head, witness thought, was lying on the saddle-bags.

Willie Wood, for the State, testified that he had been present but a few moments when the difficulty began. Defendant and Erwin were quarreling; Erwin said if he had the defendant out of town he could whip him. Defendant said he would not go, and that there was as good a place as any. Erwin said "square yourself." Defendant got up and approached Erwin, and the latter said "sail in." Defendant knocked Erwin down, and then James Porter struck at the defendant with saddle-

bags, and they went into the saloon scuffling. Witness thought but was not certain that the defendant went in foremost. While Erwin and the defendant were quarreling, Cicero Porter was standing on the sidewalk. James Porter stepped out of the saloon just as the defendant struck Erwin. Cicero Porter went into the saloon through the door next the barber shop. When the defendant and James Porter got inside the saloon, the latter and Stillwell got together, and the defendant went towards the back end of the room. Witness was then standing with his head between the lattice doors just far enough to see; but as he observed the defendant going towards the rear of the room some person from the inside ran against witness and knocked him outside the doorway. Witness heard Cicero Porter say, "Lucian, don't shoot me, I am not armed;" and immediately a shot was fired, and Cicero Porter said, "Oh Lucian, what did you shoot me for, and me not armed." (Defendant, it seems, was usually called Lucian, presumably his middle name.) Witness knew Cicero Porter's voice well, and could not be mistaken about it. The exclamations came from about the middle of the room, where the body of Cicero Porter was found. There were two shots fired after Cicero Porter asked the defendant not to shoot him. The last that the witness saw of the defendant, the latter was about six feet from where Cicero Porter's body was found, and he was still going in that direction. Witness did not see any of the shooting.

On cross-examination the witness said he was a second cousin to James and Cicero Porter. The defendant knocked Erwin down with his fist. Witness was sitting in a chair on the sidewalk, between the main door of the saloon and the door next the barber shop, and Erwin's head when he fell was close to witness's feet. Ten or fifteen persons were sitting or standing on the sidewalk, and they began to scatter when the defendant struck

Erwin. James Porter struck the defendant's head or shoulders with the saddle-bags, and they seemed tolerable heavy. Cicero Porter was then standing at the door next the barber shop. Witness did not see the defendant draw a pistol, and thought if he had drawn one before going through the lattice doors, he, the witness, would have seen it. Defendant was in front of James Porter as they went in, and had hold of him with his left hand. Witness saw James Porter, Stillwell, and the defendant inside the saloon, but not Cicero Porter. The witness denied that he had made certain statements inconsistent with portions of his testimony, and in some particulars was subsequently contradicted with respect to them by witnesses introduced by the defense. In his re-examination he stated that he could not see the right hand of the defendant as the latter went into the saloon. Defendant's back was towards James Porter as they went in. On re-cross-examination he stated that the defendant drew no pistol up to the time he entered the house.

J. P. Semones, for the State, testified that he went into the saloon very soon after the shooting. Both James and Cicero Porter were still breathing when witness went in. He examined the bodies and pockets of both of them, and found no weapon upon either. A pair of saddle-bags was lying under James Porter's legs; a pistol was in one end of them, and a bundle of merchandise was on top of the pistol. Witness stated that the flap of that end of the saddle-bags was down, but whether it was buckled down or not he could not say. The other end was buckled down. Cicero Porter's body lay in front of the counter and about midway the saloon, with the head towards the counter. James Porter lay between the end of the counter and the front of the house, with the head next the south wall. Cicero Porter was shot in the left side, and his clothing was powder-burned.

Dr. J. S. Pugh, for the State, testified that he saw the

bodies of the two Porters, about an hour and a half after they were shot. James had been shot first in the top of the head, and then the muzzle of the pistol had been pushed into the hole made by the first shot, and a second shot fired, bursting the skull and scattering the brains. Cicero was shot between the fourth and fifth ribs on the left side, perforating the apex or lower end of the heart. His clothing was powder-burned for a considerable space around the spot where the ball entered. On cross-examination the witness stated that statistics show that of persons shot through the left ventricle of the heart (as was Cicero Porter) only eighteen *per centum* spoke afterwards, and they spoke rapidly. An acute sense of hearing was necessary to understand anything said under such circumstances. A person so shot could articulate for only a few seconds, and, in witness's opinion, could not speak distinctly enough to be understood outside of the room. The words would come out like bullets, and, to hear and understand them, the listener would have to be very near and the room quiet. The witness expressed a positive opinion that nothing said by Cicero Porter after he was shot could have been heard and understood by a person standing on the pavement in front of the saloon in which the shot was fired. On his re-examination the witness was of opinion that a person shot as was Cicero Porter might have spoken in an audible voice at any instant within thirty seconds. James Porter could not possibly have spoken after he was shot.

James Gates, for the State, testified that he was in the saloon soon after the two Porters were shot, and before they died. Thomas Erwin picked up the saddle-bags, and witness examined them, and under some bundles of goods in one end he found a pistol. When Thomas Erwin picked up the saddle-bags he unbuckled the end in which the pistol was found. Neither of the Porters had any weapons about their persons.

J. L. Mayo, for the State, testified that at the time of the homicide he was sheriff of the county, and was passing along at a distance of about seventy-five yards north of Nall's saloon when the shots were fired. Hearing them and the scream of a man as if mortally wounded, witness ran towards the rear door of Nall's saloon. Defendant came out of that door and ran northward towards Hearne's saloon. Witness ran after the defendant and called on him to stop, and arrested him near Hearne's rear door, about a hundred yards from Nall's saloon. Defendant had no weapons about him then. Between his right thumb and fore-finger, and for about half their length, there was powder-burn. On cross-examination the witness said that the defendant did not stop when he first called on him to do so, nor until after witness had called upon others to stop him. Defendant was in ten steps of Hearne's saloon when he stopped, and then he came and met the witness.

W. E. Harris, for the State, testified that he was a deputy sheriff at the time of the homicide, and was in Nall's saloon five minutes after the shooting of the Porters. Being informed that a pistol was concealed in a box in the back room of Nall's saloon, he searched and found one concealed in some saw dust. It was a Colt's double-action pistol, nickel-plated, but a little rusty. ·Two barrels of the cylinder had been recently discharged, and the hammer of the pistol was resting on one of the exploded cartridges. The other barrels were loaded.

Thomas Erwin, for the State, testified that he was in the saloon a few minutes after the shooting. The saddle-bags were lying under James Porter's thighs. Witness took them up and examined their contents. In one side of them there was a pistol, and on top of it a bundle which seemed to be a dress-pattern. That side of the saddle-bags was buckled down, and witness thought it was he who unbuckled it.

George Pletzer, for the State, testified that he was in the saloon within a few minutes after the shooting, and saw R. M. Nall, William King and another man in the back room of the saloon. A pistol was lying on the floor in the corner next the front room. One of the men picked up the pistol, and Nall put it in a box and covered it with saw dust. Witness at once informed Deputy Sheriff Harris, and saw him take the pistol out of the saw dust.

B. H. Knowls, for the State, testified that when the Porters were killed he was eighty or ninety yards southwest of Nall's saloon, and could plainly see the front of the saloon. He heard shots, and saw Reuben Stillwell come out of the saloon, walking backwards, with a pistol in his hand, and then step back into the doorway, and with his left hand hold open the north side of the lattice door. Just as he did so, the witness heard a shot back in the saloon, and thought he heard some one halloo there. Stillwell dodged a little to one side, and then presented his pistol rather across the door and towards the corner at his right. Witness heard another shot, and saw smoke about Stillwell. On cross-examination the witness said he could not say positively who fired the two shots of which he spoke, but he was satisfied that Stillwell did not fire the first of those two shots. It was fired in the interior of the saloon while Stillwell was standing in the front door. With the testimony of this witness the State closed.

Wiley James was the first witness introduced by the defense. He stated that he was sitting on the bench and alongside of the defendant before the difficulty began. Stillwell came up and took a seat by the defendant. James Porter and several other persons were there. Cicero Porter and Dr. Erwin came up, and the latter asked defendant if he was " on the fight." Then Dr. Erwin and Cicero went into the saloon, and directly they came out

again, and Dr. Erwin said to the defendant, " Cicero says he can whip you, and I second it." Dr. Erwin cursed defendant, called him a d—d rascal, and told him that if the Porter boys couldn't whip him he could. Cicero Porter said to the defendant, " I had nothing against you, but you acted the d—d rascal." James Porter said, "Yes, you did." Defendant said, "Maybe so." Then Stillwell said to the defendant, "Do you acknowledge that what they say is true?" Defendant said, "Yes," and then Stillwell said the Porters ought to be satisfied, and both the Porters said they were satisfied. When James Porter came out of the saloon he said: "Lucian, why didn't you ask me what I wanted to whip you for? I could have told you, d—d quick." He also told defendant that he had gone to the barbecue last week to see him, but did not find him. Defendant replied, "You have been hunting me, have you?" and James Porter said, " No, but I thought I would see you and we could settle it." The defendant told Dr. Erwin he was not afraid to fight him, but did not want the whole mob to jump on him. Stillwell said he was a friend to both parties, and the mob should not jump on defendant. The Porters said they would not jump on the defendant. Dr. Erwin was standing about the middle of the sidewalk and in front of the defendant, who was sitting on the bench at the outer edge of the sidewalk. Erwin cursed the defendant for three or four minutes, and the defendant got up, started towards Erwin, and began to pull off his coat, but did not do so. Erwin told defendant to hit him first, and the defendant knocked him down. Witness's attention was then turned to Erwin, and he did not see the defendant go into the saloon. He thought Cicero Porter went into the saloon through the door next the barber shop. James Porter and Dr. Erwin were drinking; the defendant was sober. When the firing began, the witness ran and stood in the door of Hanway's store, and as he

passed the north door of the saloon he looked in and saw the defendant and Cicero Porter near the front end of the counter. Witness thought Cicero Porter had hold of defendant's back, but the witness added that Cicero may have been " trying to part them,"— meaning, it is inferred, the defendant and James Porter. About three-quarters of an hour before the difficulty the witness saw the defendant and Cicero Porter at Dunn's saloon, and heard defendant then ask Cicero what James Porter wanted to whip him for. Witness, apprehending a difficulty, told them that they had been good friends, and ought not to fall out about something Jim Porter had said. They both said no, and the matter was dropped. Witness did not see Willie Wood on the pavement during the shooting, nor did he see Stillwell come out of the saloon with a pistol in his hand, and then return.

John Smith, for the defense, testified that when the difficulty between defendant and Dr. Erwin began he was in the door or on the sidewalk before English's store, and was eight or ten feet from the crowd in front of Nall's saloon. Witness first heard Erwin cursing the defendant. Speaking to the defendant, Erwin said, " We can whip you." The defendant replied, " Say what you have got to say, and go on; I can't fight." James Porter said to the defendant, " G—d d—n you, I went to the barbecue to hunt you and didn't find you, and I have come here to-day to hunt you, and now I have found you and you won't fight,— you won't settle it, and you won't name your time and place." Defendant replied: " You went to the barbecue and you came to town to hunt me, did you ?" James Porter said: " No, not particularly to hunt you, but to see if we couldn't settle it." Cicero Porter said to the defendant: " You have acted the s——, and the G—d d—n s——, and we can whip you." Erwin said Cicero Porter could whip defendant, and what Cicero couldn't do he, Erwin, could. Stillwell said he was a

friend to both parties, but that the whole crowd should not jump on the defendant. Erwin began cursing the defendant again, and defendant got up and said to Erwin, "You hit me." Erwin replied, "No, you hit me," and then the defendant knocked Erwin down, and turned to go into the saloon. As he turned, James Porter struck him over the head with the saddle-bags. Defendant and the two Porters rushed into the saloon, and witness went into English's store. He heard the parties fall inside the saloon door. He started towards the back door of English's store and heard two shots fired in Nall's saloon; and then he turned back towards the front of English's store, and before he reached the front door he heard two more shots fired in Nall's saloon. Witness saw Reuben Stillwell out on the sidewalk with a pistol in his hand. This was the only pistol seen by the witness in the hands of any of the parties. If the defendant had had a pistol during the incidents related, the witness thought he would have seen it. While going into the saloon the defendant was in front of James Porter, and the latter had hold of him. On cross-examination by the State, the witness said that while the shooting was going on, he heard some one in the saloon cry out "Oh, oh," several times. When the parties went into the saloon he heard a slam, and thought they had fallen.

Billy Boyett, for the defense, stated that he was inside the saloon at and before the beginning of the affray. Just before the fight began, James Porter came into the saloon with his saddle-bags. Holding them with his left hand, he had his right hand below the counter and seemed to be unbuckling the saddle-bags. Somebody asked him what he was going to do, and he said something about a cigar. On his cross-examination the witness stated that he did not know whether James Porter was unbuckling his saddle-bags or not; witness could not see Porter's hands at the time. Witness is a brother-in-law of the defendant.

Charles Needham, for the defense, stated that he was present while Dr. Erwin was "bemeaning" the defendant in front of the saloon. Defendant said: "Dr. Erwin, you must want to whip me mighty bad." Erwin replied: "Yes, I will whip you if you will come out of the corporation." The defendant said they could fight as well where they were, and then Erwin said, "spread yourself then." Defendant got up and told Erwin to hit him first, and Erwin replied, "No, you hit me;" and then the defendant struck Erwin and knocked him down. James Porter struck the defendant with his saddle-bags, and defendant caught him by the arm and pushed him towards the saloon door. Cicero Porter caught the defendant by the neck and shoulders, and all three of them went into the saloon scuffling. James Porter was the foremost of the three, but he went in backwards, and kept running his hand into his hip-pocket. Witness ran into English's store. The combatants fell as they went into the saloon, and the firing began as soon as they got in. Witness heard three or four shots. He did not see defendant have a pistol, and, as he watched the defendant, he thought he would have seen one if exhibited by the defendant. Witness did not see Willie Wood that day. On cross-examination the witness stated that he did not hear either of the Porters say anything. When James struck defendant with the saddle-bags each of them clenched the other by the arms, and they went into the saloon that way, James Porter being foremost and the defendant pushing him. Cicero caught defendant by the shoulders as they went into the saloon. Witness had never told any one that Cicero Porter went into the saloon through the door next the barber shop.

Jim Curry, for the defense, testified that he and others, besides the defendant, were sitting on the bench in front of the saloon when Cicero Porter and Dr. Erwin came up, and the latter told the defendant that what the Porter boys could not do he could, and to name his time, form

and place and he, Erwin, would be ready for him. De-
fendant said, "Doctor, you must want to whip me
mighty bad." Erwin said, "I do, and if you don't think
I can do it, get up." Defendant said he could not fight
the whole crowd, and Stillwell said he was a friend to
both parties, and the whole crowd should not jump on
defendant there. Defendant got up and knocked Erwin
down, and then turned to go off and James Porter struck
him over the head and shoulders with the saddle-bags.
Defendant and the Porters then rushed into the saloon,
the former in front, and James Porter continuing to
strike him over the head and shoulders as they went in.
Before the defendant struck Erwin, Cicero Porter said
that defendant had acted the d—d rascal, and James
Porter said that defendant had acted more than the
d—d rascal. Witness got up when the defendant did,
and when the latter struck Erwin the witness ran into
English's store. After witness got in English's store, he
heard a noise as if the combatants had fallen into the
saloon, and heard a voice say, "I don't want to hurt you
but you must not crowd me." Witness thought it was
Stillwell who said this, but he did not know Stillwell's
voice, though they had met frequently. Witness heard
four shots. On his cross-examination the witness reit-
erated positively his statement that James Porter was
striking defendant with the saddle-bags as they were
going into the saloon, and that the defendant was in front,
with his back to the Porters, and was followed by both
of them.

Wash Utzy, for the defense, stated that when he got
in front of the saloon on the day of the homicide Dr.
Erwin was cursing the defendant, who said, "Dr. Erwin,
you must want to whip me mighty bad." Erwin replied
"No, I don't want to do it, but I can do it," and snapped
his fingers in the defendant's face. Erwin said if the de-
fendant would go out of the corporation he could whip

him; to which the defendant replied, "No, this is as good a place as any." Then Erwin told the defendant to "square" himself, and the defendant got up and knocked Erwin down. James Porter then struck the defendant over the head with the saddle-bags. Defendant went into the saloon with James Porter following him. Witness caught James Porter by the coat, and tried to keep him from going into the saloon, but he went in and pulled witness in after him. As soon as they got inside Reuben Stillwell shot at James Porter, who turned towards Stillwell and said "what are you shooting me for," and Stillwell immediately shot James Porter in the top of the head, spattering his brains upon the witness, who then ran out of the saloon and into English's store. He saw no one in the door as he came out. James Porter had got near the corner of the counter when the first shot was fired by Stillwell, who was standing between the end of the counter and the front of the saloon, and against its south wall, and was on the right of James Porter when he fired. Witness's attention was so engrossed by them that he did not see the defendant and Cicero Porter after they got inside. Defendant had no pistol so far as witness saw. Before defendant struck Erwin, James Porter said to the defendant, "You acted the d—n rascal with me this morning, and that is all I have to say about it." Witness did not see Willie Wood there.

On his cross-examination the witness said he was certain that James Porter and the defendant did not have hold of each other as they went into the saloon, and that the former was not then striking at the latter with the saddle-bags. Defendant was three feet ahead of James Porter, who, as he entered the saloon, held the saddle-bags with his right hand, and hanging down by his side; and he made no effort to use them, open them, or take anything out of them. Nor did James Porter run his hand in his hip-pocket as he went into the saloon; wit-

ness had hold of him, and, had he done so, would have known it. Cicero Porter did not catch defendant by the shoulders, or have his hand on defendant, when the latter was going into the saloon. Witness was certain that Cicero did not go into the saloon at the same door as defendant and James Porter, though witness could not say by what entrance Cicero did go in. This witness did not see Jim Curry or Wiley James there.

Tom Nunn, for the defense, stated that in the morning of the day on which the Porters were killed they and the defendant were at Dunn's ten-pin alley. James Porter and William King were rolling ten-pins, and Dr. Erwin was betting on the former, who told Erwin not to bet on him, as he couldn't play. Erwin said that he couldn't play, but he could whip the defendant, and James Porter said "I can do that myself." James Porter and Erwin soon left the alley, and the defendant asked Cicero Porter what James wanted to whip him, defendant, for, and said he had nothing against the Porters. Cicero replied that until a few days before that time he had nothing against the defendant, but that defendant had acted the d—d rascal.

On the cross-examination of this witness he said that the conversation between defendant and Cicero Porter at the ten-pin alley occurred three-quarters of an hour before the difficulty at Nall's saloon. Cicero said that the defendant had acted the d—d rascal about "that picture," and said that the defendant was a dirty dog; but did not say what picture. Defendant said "that is durned hard to take, and I have taken enough," and got up from where he was sitting. Some one caught him, and he said "What do you mean? turn me loose." He was turned loose, and then some one got hold of Cicero Porter. State's counsel asked the witness if Cicero Porter did not say that the defendant had acted the d—d rascal in mutilating a picture of Porter's sister and sending it

to her with an insulting note. The witness replied that Cicero Porter said nothing about a note or whose picture it was. Witness stated that the defendant, previous to the altercation at the alley, said to him, the witness, that he, defendant, had done wrong in tearing up the picture and sending it to Miss Porter. When William King and James Porter were rolling ten-pins Erwin said "we can whip Lucian Reed," and James Porter said: "It don't take *we* to do it; I can do it myself." The witness insisted that in his examination in chief he did not say that Erwin's expression was that *he* could whip defendant. Defendant and James Porter seemed to be friendly at a previous meeting between them that same morning. After the Porters left the ten-pin alley the witness told defendant he was the biggest coward he ever saw, taking the abuse he had.

Charles Sibrell, for the defense, testified that he saw Dr. Erwin take a new pistol out of a desk in Tom Erwin's store in Bryan, the day the Porters were killed; but did not know whether Erwin carried the pistol out of the store or not.

Jack Buchanan, for the defense, stated that he saw the two Porters, Dr. Erwin and defendant together on horses in Bryan, the morning of the homicide. Witness asked James Porter what was up, and James Porter said they were going to have a race, and asked witness if defendant's horse could run fast. Witness told him that the defendant's horse could beat his, Porter's, horse mighty bad. James Porter said he did not care,— he would run the race anyhow. Dr. Erwin said, "Come on, let's go," and then the defendant said, "Let's wait for Nall and Stillwell." Erwin rejoined, "D—n Nall and Stillwell, we don't want to wait for them; let's go and run the race." Witness was a neighbor of defendant, and had known him several years; had never heard him spoken of as a violent or dangerous man, but had never heard his

character or reputation in that respect called in question or discussed among his neighbors. The defense, after contradicting by several witnesses some denials made by the State's witness Willie Wood, closed the evidence in the case with the testimony of several other neighbors of the defendant, respecting his reputation for violence or the contrary. They concurred in stating that his reputation in that respect had not been a matter of discussion one way or the other.

*Beall & Taliaferro*, and *Henderson & Henderson*, filed an able argument for the appellant.

*H. Chilton*, Assistant Attorney General, for the State. The common law rule, which is admitted to be controlling, brings W. E. Collard within the third degree to Reuben Stillwell; but the presiding judge was not related in any degree to B. L. Reed. It is a principle governing all questions of jurisdiction or capacity that the allegations or face of the papers must govern. Reed and Stillwell are jointly *charged*. Reed and Stillwell are both arrested and put on trial,— in such case is the judge disqualified? Clearly so.

But suppose Reed and Stillwell, being both in arrest, ask a severance. Can the regular judge try one? Clearly not, because in the first place he *has no capacity* or *authority* to *grant the severance*, his kinsman being a *party* thereto. But suppose Reed is arrested and Stillwell flies from justice; what then, according to appellant's reasoning, renders the judge qualified? Clearly Stillwell's illegal act,— the escape.

Suppose Stillwell is in arrest at the first term of the court; who then tries the case of Reed and Stillwell? A special judge. But suppose the case is not tried and Stillwell escapes before the second term; then, forsooth, the authority of the special judge is ousted and Judge Col-

lard ascends the bench and grants a second continuance to Reed. Before a third term, Stillwell is re-arrested, and then the jurisdiction of the special judge re-attaches to Reed's case.

It seems to me these illustrations are sufficient to expose the argument of appellant.

HURT, J. Reed was convicted of murder of the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years.

One Reuben Stillwell and the appellant were jointly indicted for the murder of Cicero Porter. Stillwell was related to the regular judge (W. E. Collard), being his second cousin. W. E. Collard, being thus related to Stillwell, certified his disqualifications to the governor, who appointed as special judge A. C. Brietz. When the cause was reached and called for trial, the defendant pleaded that the special judge had no proper jurisdiction of defendant or of said cause; that the regular judge of said court, W. E. Collard, was in no manner disqualified to try the case. This plea was overruled by the special judge and defendant excepted.

Article 569, Code of Criminal Procedure, provides that no judge shall sit in any case where the accused may be connected with him by consanguinity or affinity within the third degree. The judge shall not "sit," which evidently means make any orders in or try any case when the party accused, meaning the party to be tried, is related within the third degree. If not related within the third degree, it is the duty of the judge to sit and try the cause; and the defendant has the right to demand a trial by a regular judge. Nor can the judge recuse himself, nor the governor appoint a special judge, unless the regular judge is disqualified, or comes within some of the provisions of the statute authorizing the election or appointment of a special judge.

The question, therefore, is, was the regular judge disqualified to sit and try this defendant? It is not pretended that this defendant was related in any degree to the judge. The only ground of disqualification was the relationship between him and Reuben Stillwell. But Stillwell had not been arrested; there was no possibility of his being tried. Hence we have this proposition;— when a case is reached and called for trial, is the regular judge disqualified by reason of the fact that some relation within the disqualifying degree is jointly indicted with defendant, though not arrested? We are of the opinion that he is not. There was nothing to prevent his sitting in this cause and trying this defendant. If, then, he was not disqualified to try the defendant, he could not recuse himself, nor could the appointment of the governor invest the special judge with the power legally to try the defendant.

If, however, Stillwell had been arrested, he and defendant being jointly indicted and the regular judge being related to Stillwell, the right of the special judge to try Stillwell would have carried with it the right to try the defendant. This, however, was not the case; Stillwell had not been arrested; the defendant alone could have been tried, and there was no obstruction in the way of the regular judge to try him.

Collateral consequences which may result favorably to Stillwell are not embraced in the statute. Is the regular judge related in the third degree to the person to be tried is the question; if not, though his partiality for his relation jointly indicted may redound to his benefit, still under the statute on this subject the regular judge is not disqualified.

It is insisted that the court should have given the charge asked by the defendant in regard to a conspiracy between certain parties and deceased. There was no evidence to support the charge, in the shape it was worded, and the

court had given all that was required under the evidence, under the head of self-defense.

The only serious question presented is whether the facts, or any part of the evidence, justified a charge to the effect "that if Stillwell killed Porter with malice, etc., and the defendant was present, and, knowing the unlawful intent of Stillwell, aided, abetted, or encouraged him in the act, that the jury should find him guilty." This is a correct proposition of law: was there a sufficient foundation laid in the evidence to invoke its application? We think so. (The Reporters will give the evidence.)

We have examined each assignment made. Though there are quite a number of interesting questions presented, we have failed to discover such error as will require a reversal of the judgment, except the first discussed in this opinion. The court should have sustained the plea of the defendant to the power and jurisdiction of the special judge to preside in the case.

For this error the judgment is reversed and the cause remanded.

*Reversed and remanded.*